# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 21-01314-EG |
| | Chapter 13 |
| James Eric Sapp, | **ORDER** |
| Debtor(s). | |

**THIS MATTER** comes before the Court upon the objection to James Eric Sapp's ("Debtor") Motion to Sell property at 108 Mark I Road, Lexington, SC 29072 (the "Residence")[1] and the Motion to Modify Confirmed Chapter 13 Plan (the "Motion to Modify Plan"),[2] both filed by Pamela Simmons-Beasley, the Chapter 13 Trustee appointed in Debtor's case (the "Trustee").  Debtor's ex-spouse filed an objection to the Motion to Modify Plan.[3]

The facts and issues presented revolve around the family court's post-confirmation divorce decree, which incorporated and approved a settlement agreement that Debtor and his ex-spouse entered into over a year after Debtor's chapter 13 plan was confirmed, establishing the division of marital property and Debtor's domestic support obligations. Pursuant to the settlement, Debtor waived his half interest in the marital home's equity— consisting of $152,033.27 in non-exempt proceeds from the sale of the Residence in exchange for his ex-spouse's waiver of alimony.  There is no dispute that Debtor's ex-spouse is entitled to half of the sale proceeds from the sale of the Residence or that Debtor's

---

[1] ECF No. 39, filed Sept. 29, 2023, and objection filed thereto at ECF No. 41 on Oct. 9, 2023.
[2] ECF No. 42, filed Oct. 9, 2023.
[3] ECF No. 49, filed Oct. 30, 2023.

half interest in the non-exempt sale proceeds is property of the estate. There is also no dispute that Debtor's income has increased substantially since he filed for bankruptcy, warranting the post-confirmation modification of Debtor's plan pursuant to 11 U.S.C. § 1329 to increase monthly plan payments to the Trustee.

The issue the parties are asking the Court to decide is *not* whether the Plan should be modified; rather, *how* it should be modified. The Trustee contends that the Court should invalidate the provision in the post-confirmation divorce decree approving Debtor's waiver of his interest in the proceeds from the sale of the Residence and that the Plan should be modified to increase the payments to capture *both* Debtor's increase in salary *and* the proceeds from the sale of the Residence. To the extent the Court does not invalidate the settlement agreement approved by the family court, the Trustee argues that the ex-spouse's claim to Debtor's proceeds from the sale of the Residence is in the nature of a property settlement, which should be treated as an unsecured claim—not a domestic support obligation entitled to priority.

A hearing on Debtor's Motion to Sell the Residence and the Trustee's Motion to Modify Plan was held on November 9, 2023. A total of 16 exhibits were introduced into the record without objection. Debtor and his ex-spouse, Marina Sapp ("Ex-spouse"), testified. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), (M), (N), and (O). Based upon the pleadings filed with the Court, the evidence presented, and a careful review of the entire record before it, the Court concludes that the settlement agreement approved by the family court is not invalid, Debtor's obligation pursuant to the family court order to pay his interest in the proceeds from the sale of the Residence to Ex-spouse is in the nature of

alimony, and Debtor shall modify the Plan to increase the payments as a result of his increased salary. The Court makes the following findings of fact and conclusions of law as set forth below.[4]

## FINDINGS OF FACT

### I.    Bankruptcy Filing

Debtor and Ex-spouse were married in 1996 and have two adult children born of their marriage. On May 12, 2021 (the "Petition Date"), Debtor filed for Chapter 13 bankruptcy relief.[5] Debtor has been represented by bankruptcy counsel throughout the case.[6] In his original Schedules and Statements of Financial Affairs,[7] he lists ownership in the Residence, with a value of $580,000.00. Schedule A/B (Property) further indicates that the Residence is co-owned with Ex-spouse and was purchased in November of 2015 for $440,000.00. The Residence was titled in the names of both Debtor and Ex-spouse as joint tenants with rights of survivorship.[8] As of the Petition Date, the Residence was encumbered by two mortgages to Navy Federal Credit Union ("Navy Federal")—a first mortgage in the amount of $386,115.58 and a home equity line of credit ("HELOC") in the amount of $48,022.81. Both Debtor and Ex-spouse were liable on the mortgages as borrowers and mortgagors.[9]

As of the Petition Date, Debtor had been unemployed since February of 2021. Original Schedule I (Income) reflected that Ex-spouse was earning a gross monthly salary

---

[4] To the extent the following findings of fact are conclusion of law, they are adopted as such, and vice versa.
[5] From the Petition Date to May 31, 2023, the Honorable David R. Duncan presided over the case. It was then transferred to the undersigned upon his retirement.
[6] On July 12, 2023, the Court approved the substitution of Debtor's counsel because of his former attorney's retirement from the practice.
[7] ECF No. 13, filed May 26, 2021; Debtor's Ex. 1.
[8] Ex-Spouse's Ex. 1.
[9] Debtor's Ex. 1.

of \$4,583.00—\$3,414.00 net after payroll deductions.[10]   Debtor was earning \$500.00 a

month working part time, and he listed future expected net income of \$1,650.00;

accordingly, their combined net income as of the Petition Date was \$5,564.00.   Original

Schedule J (Expenses) reflected no dependents, monthly expenses of \$5,170.67, including

mortgage payments of \$2,214.11, leaving monthly net income after expenses of \$393.33.[11]

At the hearing, Debtor testified that on June 18, 2021 he accepted a position with Hitachi

Rail STS USA Inc., earning an annual base salary of \$95,000.00 with the possibility of

annual bonuses.[12]   Aside from the four months that he was unemployed in 2021, both

Debtor and Ex-spouse testified that during their 26-year marriage, Debtor earned more than

Ex-spouse and provided the main financial support for the family.

On September 28, 2023, Debtor filed amended Schedules B, C, I, and J.   Debtor

raised his claimed homestead exemption from \$57,000.00 to \$65,500.00 pursuant to S.C.

Code Ann. § 15-41-30(A)(1)(a).[13]   Amended Schedule I (Income) reflects Debtor's

monthly gross salary of \$8,241.24 plus non-guaranteed bonuses—net income of

\$5,651.55—from his employment at Hitachi Rail STS USA Inc.   Amended Schedule J

reflects Debtor's monthly expenses of \$3,241.16, leaving a monthly net income after

expenses of \$2,409.39.   At the hearing, Debtor testified that in November of 2022, when

he entered into a settlement agreement concerning his divorce, he was making

---

[10] *Id.*

[11] *See id.*   Original Schedule J indicates that while Ex-Spouse had substantial debts, she was not paying her debt at the time to help Debtor's Chapter 13 plan work.

[12] Debtor's Ex. 3.   At the hearing, the Trustee questioned Debtor as to the failure to amend his schedules to reflect the increased salary in 2021.   Debtor testified that at the § 341 meeting of creditors, he stated under oath that he was expecting to receive a job offer in the near future.   He also testified that the offer was received the day following the meeting of creditors, and he informed his counsel of the increase in salary. *See* Debtor's Ex. 4.

[13] At the hearing, the Trustee indicated that she has no objection to the increased amount of the exemption asserted and indicated that \$152,033.27 is the amount of the non-exempt proceeds she asserts the estate is entitled to after subtracting the full amount of the exemption claimed.

approximately what is reflected in the amended schedules. He further testified that while

he had been earning that amount since the summer of 2021, he had no disposable income

available once his Spouse filed for divorce and the family court ordered him to make

alimony payments and pay approximately $1,900.00 in mortgage payments on the

Residence for the benefit of Spouse until June of 2023.

Debtor's Chapter 13 Plan[14] was confirmed on September 21, 2021 (the "Plan").[15]

The Plan contemplates payments of $352.00 for 60 months, with non-priority unsecured

creditors estimated to receive payment of less than 100% of their claims. It further provides

that Debtor will make regular payments on both the first and second mortgages directly to

the mortgage creditor. Section 7.1 of the Plan included the following standard language:

> **Property of the estate will vest in the debtor as stated below:**
>
> Upon confirmation of the plan, property of the estate will remain property
> of the estate, but possession of property of the estate shall remain with the
> debtor. The chapter 13 trustee shall have no responsibility regarding the
> use or maintenance of property of the estate. The debtor is responsible for
> protecting the estate from any liability resulting from operation of a business
> by the debtor. Nothing in the plan is intended to waive or affect adversely
> any rights of the debtor, the trustee, or party with respect to any causes of
> action owned by the debtor.

The Confirmation Order included the following language that was standard at the

time:[16]

> The debtor shall not sell, encumber, or otherwise transfer any interest in
> estate property outside the ordinary course of business without approval of
> the court, and shall not incur indebtedness except as provided in SC LBR
> 3015-8.[17]

---

[14] ECF No. 21, filed on July 26, 2021; Debtor's Ex. 2.

[15] ECF No. 24; Trustee's Ex. F.

[16] The local form Confirmation Order was amended in 2022 to remove that language.

[17] SC LBR 3015-8 in effect at the time the Plan was confirmed provided:

> **LOCAL RULE 3015-8: PROCEDURE FOR CHAPTER 13 DEBTORS OBTAINING
> CREDIT**
> **a. By consent**. For amounts of $25,000 or less:

## II.      Relief from Stay to Seek Divorce and Divorce Proceedings

On December 1, 2021—approximately two months after the Plan was confirmed—

Debtor and Spouse submitted a Consent Order Lifting Stay to proceed with a divorce action

in family court, which the Court approved.[18]  The order granted relief from the automatic

stay to permit Debtor and Spouse to adjudicate the following actions in the Family Court

for the Eleventh Judicial Circuit in Lexington County, South Carolina (the "Family

Court"): "equitable division, college expenses, alimony, health insurance, and attorney fees

and costs."  The Consent Order Lifting Stay expressly provided:

> It is Therefore, ORDERED, ADJUDICATED, AND DECREED that the
> automatic stay is lifted pursuant to 11 U.S.C. § 362 and is hereby modified
> to allow the Family Court to hear, approve, and order the above.  However,
> additional relief from stay is necessary for the enforcement of marital
> obligation against property of the estate or to hold the Debtor in civil
> contempt.  The parties and the Chapter 13 Trustee further agree that upon
> motion by an interested party, this Court shall have the ability to review the

---

1. the chapter 13 trustee may approve a debtor's request to obtain credit,
without an order of the Court, and the document evidencing such
approval shall be filed with the Clerk of Court; or
2. the debtor may file a proposed order, containing the chapter 13
trustee's consent, for consideration by the Court.
**b. By motion**. If a debtor does not obtain the consent of the trustee under subdivision (a)
or if the amount exceeds $25,000, the request shall be by motion.

Notably, the rule was substantially revised effective December 1, 2021, and currently reads as follows:

**LOCAL RULE 3015-8: CHAPTER 13 POST CONFIRMATION TRANSACTIONS**
In addition to any other authority granted to the debtor(s), and notwithstanding any plan
provision or order confirming a plan, the debtor(s) may, without court or trustee approval:
1. acquire assets;
2. obtain credit;
3. use cash collateral or insurance proceeds derived from a casualty to
property of the debtor or the estate, paying any lienholder to the extent
of any lien; and
4. settle or compromise matters not pending before the bankruptcy court
in which the debtor(s) is a litigant or beneficiary.
If not otherwise reportable under any other Bankruptcy Code section or Rule, the debtor(s)
shall file a report within 10 days of any of the above events, in substantial conformance
with the local form, when the event(s) alters by a net value of $25,000 or greater either the
net value of the total property or the total debt of the debtor(s) or the estate, or when the
event(s) impacts a claim paid by the trustee under a confirmed plan.

[18] ECF No. 27; Debtor's Ex. 7.

determination by the Family Court as it may relate to the Debtor's Bankruptcy Case.

Spouse filed for divorce on or about December 7, 2021. The parties were formally separated on March 18, 2022. On April 7, 2022, the Family Court entered a Temporary Order,[19] which found that Spouse had made a *prima facie* case of adultery and was entitled to sole possession of the Residence on a temporary basis. The Temporary Order further required both parties to split the costs of the first mortgage on the Residence ($1,384.86 each) and required Debtor to pay (a) the full HELOC monthly payment of $512.12; (b) spousal support in the amount of $1,300.00 per month on a temporary basis, and (c) Spouse's attorney's fees in the amount of $8,873.73. Accordingly, between the alimony and mortgage payments on the Residence, Debtor was obligated to make support payments totaling $3,196.98 per month. The Family Court ordered that mediation be conducted.

Following mediation, on November 9, 2022, Debtor and Spouse entered into the Full and Final Settlement Agreement (the "Settlement Agreement").[20] Pursuant to the terms of the Settlement Agreement, Spouse would continue to have exclusive use and possession of the Residence, under the following conditions:

A. REAL ESTATE

Commencing December 1, 2022 and for 6 months thereafter (May 1, 2023), or until the sale of the house is closed, whichever is sooner, [Debtor] shall continue to pay ½ of the monthly mortgage, the HELOC, and $1,300 per month in alimony directly to [Spouse]. After this time period, [Spouse] shall be responsible for making the timely payment on all expenses associated with the marital home. [Spouse] shall list the home for sale by March 1, 2023 and continuously list the house for sale. . . . [Debtor] shall cooperate in a timely manner to help effectuate the sale, if necessary. At closing, the parties shall pay off the mortgage and HELOC. At closing

---

[19] Debtor's Ex. 7.
[20] Trustee's Ex. C.

[Debtor] shall be entitled to $28,000.00 from the net proceeds for the sale of the marital home.

[Debtor] has been paying [Spouse] $1,300 in monthly alimony.  In lieu of a continued direct payment of alimony, [Debtor] waives his interest of the equity in the home in excess of $28,000 in favor of [Spouse].  The parties intend for this compromise to reflect [Debtor's] **domestic support obligation to [Spouse]**, and [Spouse] shall receive all remaining net proceeds from the sale of the marital home.

. . .

X. ALIMONY

Commencing December 1, 2022 and for 6 months thereafter or until the former marital home is closed on, whichever is sooner, [Debtor] shall pay alimony to [Spouse] in the amount of $1,300.00 per month.  This payment shall be paid on or before the first day of each month and paid directly to [Spouse].

Wife waives all other claims or right to support **other than that which is specifically referenced herein**.  The terms of Husband's support obligation are non-modifiable and shall terminate as described herein.[21]

According to Spouse's testimony, the intent was for the proceeds from the sale of the Residence to be a lump sum alimony payment, to be used to purchase a more affordable home for herself in Lexington, SC and continue to take care of herself throughout her lifetime.  Under the Settlement Agreement, Debtor continued to be responsible for paying $1,300.00 per month in temporary alimony to Spouse, half of the mortgage payment, and all of the HELOC payment for a brief period while they marketed the home—support payments totaling approximately $3,000.00 a month.  They agreed for the $1,300.00 per month alimony payments to end in June of 2023 because they expected the Residence would sell by then.  As part of the Settlement Agreement and in exchange for the lump sum payment from the sale of the Residence, Spouse also agreed to waive her right to Debtor's

---

[21] *Id.* (emphasis added).

pension and retirement accounts as well as her right to receive attorney's fees ordered to be paid under the Temporary Order.

On May 12, 2023, the Family Court entered the Divorce Decree and Order Approving Agreement (the "Divorce Decree"), granting Spouse a divorce from Debtor on the statutory grounds of adultery and approving and incorporating the terms of the Settlement Agreement.[22]  In the Divorce Decree, the Family Court expressly found that the parties entered into the agreement "freely and voluntarily" and with knowledge of each other's financial situation.  It concluded that the Settlement Agreement was "fair and equitable" and "within the bounds of reasonableness under the facts of this case."[23]

At the hearing, Spouse testified that her mother passed away in February of 2022—a month prior to the parties' formal separation.  At the time the parties entered into the Settlement Agreement, Spouse knew that she would be inheriting some funds from her mother's probate estate, but she did not know how much because the mother's house had yet to be put on the market.  In May of 2023, she received $60,000.00 from the probate estate.  With funds inherited from her mother's estate, Spouse paid off the HELOC to Navy Federal in the amount of $46,528.41 in June of 2023.  She decided to pay off the HELOC, because the Divorce Decree required her to be responsible for those payments July 2023 forward until the home could be sold and the HELOC had a high interest rate of 11%.[24]

---

[22] Trustee's Ex. B.  The Divorce Decree also incorporated the parties' agreement that "for June 2023 [Debtor] shall pay the HELOC monthly payment and [Ex-spouse] shall be responsible for the $500.00 fee associated with [Debtor's] bankruptcy.  Additionally, each party shall pay $287.50 towards the bankruptcy fee associated with the mortgage which shall be taken out of each party's portion of the equity in the home."
[23] *Id.*
[24] ex-spouse's Ex. 4.

### III.    Proofs of Claim Filed in Debtor's Case

The deadline to file proofs of claim in Debtor's bankruptcy case was July 21, 2021, while governmental agencies had until November 8, 2021.  The claims register reflects claims totaling $1,022,851.22, including $395,443.99 in secured claims and $189,533.28 in priority claims.  No objections to claims have been filed to date.

On October 27, 2023, Spouse filed Claims Nos. 15, 16, and 17.  Claim No. 15 asserts an unsecured claim in the amount of $217,533.28 for Ex-spouse's one-half interest in the proceeds as a "tenant in common" of the property sold.  Pursuant to Claim No. 16, Ex-spouse asserts a priority claim in the amount of $189,533.28 for the lump sum alimony comprised of the remaining net proceeds from the sale of the Residence, except for $28,000.00, in accordance with the Divorce Decree.  Lastly, Claim No. 17, which is contingent and only asserted if Ex-spouse is not awarded the domestic support ordered by the Family Court, is for Debtor's share of the pre-closing payoff of the second mortgage balance of the HELOC to Navy Federal in the amount of $23,264.25.  Without taking into account Ex-spouse's claims, the unsecured claims filed total $197,076.42.

### IV. Debtor's Motion to Sell and Trustee's Motion to Modify Plan

Between the entry of the Consent Order Lifting Stay on December 1, 2021 and September of 2023, the case docket reflects no significant activity.  On September 20, 2023, Debtor filed the Motion to Sell seeking approval of the sale of the Residence to a third party with no relationship to Debtor for $850,000.00.  The Motion to Sell estimates that no proceeds will be paid to the estate because Debtor's half interest would be paid to Ex-spouse as contemplated in the Divorce Decree.  The Trustee filed an objection to the Motion to Sell and also filed a Motion to Modify Plan.  Pending the hearing on the motions,

the parties agreed for the sale on the Residence to close on or about October 24, 2023 on the condition that all net proceeds from the sale would be held in the account of Dial Grimm & Rupert, LLC (the "Closing Attorney") pending further determination by the Court regarding the entitlement to the proceeds.  A consent order to that effect was entered on October 17, 2023.[25]  After payment of the outstanding Navy Federal mortgage in the amount of $364,689.64 and closing costs, the proceeds from the sale totaled $435,066.56.[26]

On October 30, 2023, Ex-spouse filed an objection to the Motion to Modify.  While she does not oppose a modification of Debtor's confirmed Plan, as it may be appropriate due to the increase in his income, Ex-spouse posits she is entitled to Debtor's one-half interest in the sale proceeds from the Residence (less $28,000.00).[27]  The parties filed a Joint Statement of Dispute prior to the hearing outlining their respective arguments and the statutory and legal authority on which they rely.[28]  A hearing was held on November 9, 2023, at which the Trustee and her counsel, Debtor and his counsel, and Debtor's former wife and her counsel appeared.

Following the hearing and with the parties' consent, the Court entered an Order on November 15, 2023, authorizing the release and payment of one half of the net equity from the sale of the Residence, being the sum of $217,533.28, to Ex-spouse.[29]  The Consent Order provided that the remainder of the net sales proceeds shall continue to be held in trust, pending further order by this Court.  The Consent Order further provided that Ex-spouse's Claim No. 15 was withdrawn.

---

[25] ECF No. 46.
[26] Trustee's Ex. A.
[27] ECF No. 49.
[28] ECF No. 51, filed Nov. 3, 2023.
[29] ECF No. 57.

## CONCLUSIONS OF LAW

Debtor listed a one-half interest in the Residence as property of the estate in his schedules.  During this bankruptcy case, the Residence has substantially increased in value—from $580,000.00 to $850,000.00.  The parties do not dispute that Debtor's share of the appreciation in value of the Residence is property of the estate.  There is also no dispute that Ex-spouse is entitled to her one-half share of the proceeds from the sale of the Residence.  As noted above, Ex-spouse's claim for her share of the sale proceeds (Proof of Claim No. 15-1) has been resolved by the Consent Order of November 15, 2023 authorizing disbursement to Spouse of this portion and withdrawing the claim.[30]  The issue is who is entitled to receive Debtor's one-half share of proceeds from the sale of the Residence.  Debtor and Ex-spouse held title as joint tenants with right of survivorship.  Pursuant to S.C. Code Ann. § 27-7-40, the Family Court's entry of the Divorce Decree severed the joint tenancy and vested interest in Debtor and Ex-spouse as tenants in common.[31]

In the Settlement Agreement, adopted and ordered by the Family Court, Debtor waived his right to receive those proceeds and agreed that his share of the proceeds should be paid to Spouse as lump sum support.  The Trustee, however, asserts that Debtor's one-half share of the proceeds should be paid to the Trustee for distribution to unsecured creditors, despite the Family Court's order, which requires those funds to be paid to Spouse.  The Trustee argues that Debtor violated the Confirmation Order by attempting to waive his

---

[30] ECF No. 57.

[31] SC Code Ann. § 27-7-40 provides that "any joint tenancy in real estate held by a husband and wife with no other joint tenants is severed upon the filing of an order or decree dissolving their marriage and vests the interest in both the parties as tenants in common, unless an order or decree of a court of competent jurisdiction otherwise provides."

right to receive half of the net sale proceeds (less $28,000.00) in the Settlement Agreement because he was prohibited from disposing of estate property without court approval.  The Trustee further contends that any claim Ex-spouse may have under the Settlement Agreement is in the nature of a property settlement and is therefore not entitled to priority as a "domestic support obligation," as defined in 11 U.S.C. § 101(14A).

As to the Motion to Modify Plan, the Trustee argues the Plan should be modified because the appreciation in the Residence and the increase in income constitute a substantial and unanticipated change in Debtor's financial condition as required under Fourth Circuit law.  Accordingly, the Trustee asserts the Plan should be modified to increase the base to include Debtor's share in his half of the sale proceeds and his excess disposable income.

Ex-spouse filed an objection to the Motion to Modify Plan asserting rights in the Debtor's interest in the proceeds because the Family Court order reflected that the parties intended for the lump sum to serve as alimony and domestic support, which should be deemed enforceable by this Court.  To the extent it is determined that the award of Debtor's interest in the equity of the Residence is not a "domestic support obligation," Ex-spouse contends that it is nevertheless a valid claim of equitable property division entitled to receive distributions in the Chapter 13 case as an unsecured claim.  Moreover, at a minimum, she claims that even if she is not entitled to Debtor's share of the equity as ordered in the Divorce Decree, she is entitled to a claim for paying off the HELOC mortgage in full, which was also a liability of Debtor pursuant to 11 U.S.C. § 509.

Debtor did not object to the Motion to Modify Plan.  He agrees with Ex-spouse that the parties intended to award her lump sum domestic support in an amount equal to

13

Debtor's net equity interest in the marital home, less $28,000.00. In addition, Debtor

agrees that Ex-spouse should also be awarded $46,528.51 of the net proceeds of the sale,

for her payoff of the HELOC mortgage.

The Court will address the following issues in turn: (a) whether Debtor was entitled

to waive his interest in the proceeds from the sale of the Residence and whether the Court

can now invalidate that provision approved in the Divorce Decree; (b) to the extent that the

Court does not invalidate the agreement as incorporated and approved by the Family Court,

whether the provision transferring the half-interest in Debtor's proceeds from the

Residence to the Ex-spouse is in the nature of a "domestic support obligation" entitled to

priority; and (c) how the Plan should be modified.

### A. The Court Will Not Invalidate the Divorce Decree Entered by the Family Court

From the outset, there is no dispute that under 28 U.S.C. § 1334(a), the district

court, acting through the bankruptcy court, has original and exclusive jurisdiction over

cases under the Bankruptcy Code. The bankruptcy court also has exclusive jurisdiction to

determine what is property of the bankruptcy estate and what is available for distribution

to creditors of that estate. *In re Foxwood Hills Prop. Owners Ass'n, Inc.*, C/A No. 20-

02092-HB, Adv. Pro. No. 20-80049-HB, 2021 WL 1812668, at *6 (Bankr. D.S.C. May 5,

2021) (citing *Anderson v. Campbell, et al. (In re Congaree Triton Acquisitions, LLC)*, Adv.

Pro. No. 15-80147-JW, slip op. at 9 (Bankr. D.S.C. Mar. 16, 2016); *All Am. Laundry v.

Ascher (In re Ascher)*, 128 B.R. 639, 643 (Bankr. N.D. Ill. 1991). Family matters, however,

have historically been reserved to the state courts. *See* 1 COLLIER FAMILY LAW AND THE

BANKRUPTCY CODE ¶ 5.01 (2023) ("Federal courts have long avoided becoming enmeshed

in state family law. The courts hearing bankruptcy cases have been no exception."). The

14

Fourth Circuit adheres to this principle, recognizing that bankruptcy courts generally defer to state courts with respect to domestic matters. *In re Robbins*, 964 F.2d 342, 344-47 (4th Cir. 1992); *Roberge v. Buis*, 95 F.3d 42 (4th Cir. 1996) (unpublished).

"The Bankruptcy Code provides a statutory injunction under [11 U.S.C.] § 362, known as the automatic stay, which freezes the collection of debts and other actions in most judicial proceedings, including state court proceedings, in order to provide a debtor with a breathing spell." *In re Parast,* 612 B.R. 710, 716 (Bankr. D.S.C. 2020). The automatic stay is self-executing and stays matters and proceedings wherever located, including some matters before the family court. *Id.* The Bankruptcy Code, however, expressly provides statutory exceptions, which permit certain proceedings to commence or continue despite debtor's filing of a bankruptcy case, including "the commencement or continuation of a civil action or proceeding . . . for the establishment or modification of an order for domestic support obligations; . . . concerning child custody or visitation; [or] . . . for the dissolution of a marriage, *except to the extent that such proceeding seeks to determine the division of property that is property of the estate*." 11 U.S.C. § 362(b)(2)(A)-(C) (emphasis added). Therefore, a family court may proceed with adjudicating the equitable division of marital property only with authorization from the bankruptcy court.

As issues of domestic law, equitable division of property, and creditors' rights have become increasingly intertwined in the bankruptcy context, it is often impractical—and at times simply impossible—to maintain a total separation between bankruptcy and family law and their respective courts. "The law that has evolved displays the ongoing tension between the desire to leave marital dissolution decisions to the state courts on the one hand and the need to deal fairly with all creditors and to ensure the debtor's bankruptcy fresh

15

start on the other." 1 COLLIER FAMILY LAW AND THE BANKRUPTCY CODE ¶ 5.01. As the

Fourth Circuit noted in *Robbins*:

> Lifting the stay would not harm the estate or the interests of their creditors. The [state] courts would determine, as they are uniquely capable of doing, the amount of the parties' claims to the marital property in question, while the bankruptcy court would retain jurisdiction subsequently to determine the allowance of claims against the estate. Other courts that have considered the issue of lifting an automatic stay in order to let equitable distribution proceedings conclude in state court have sensibly done so while retaining jurisdiction to make the subsequent distribution from the estate.

*Robbins,* 964 F.2d at 346.  *See also In re Holtzclaw,* 634 B.R. 920, 936 (Bankr. D.S.C.

2021) (requiring the non-filing spouse to seek relief from the bankruptcy court prior to the

transfer of title of any property of the bankruptcy estate and prior to enforcement of any

judgment regarding ownership of property that is property of the estate to adequately

protect the estate).  What constitutes property of the bankruptcy estate interfaces with the

division of marital property.  Intricacies presented by this interface come up when the

property is owned jointly with a spouse—such as the case here.  Because the broad reach

of 11 U.S.C. § 541(a) brings a debtor's interest in marital property into the bankruptcy

estate, any effort to divide that property is covered by the automatic stay.  Accordingly,

relief from stay must be obtained before proceeding in family court to determine the

equitable distribution of marital assets that are property of the estate.

In this case, the Court entered a Consent Order Lifting Stay on December 1, 2021,

with the consents of Debtor and Ex-spouse, expressly authorizing the Family Court to

determine, among other things, the equitable division of the parties' marital property and

determine alimony and support obligations.  Accordingly, the Family Court was acting

within the scope of its authority and without violating any jurisdictional boundaries when it entered the Divorce Decree, which addressed those issues.

The Consent Order Lifting Stay also stated that "additional relief from stay is necessary for the enforcement of marital obligation against property of the estate or to hold the Debtor in civil contempt." The Trustee does not contend that the automatic stay was violated by the waiver of Debtor's interest in the proceeds or the entry into the Settlement Agreement incorporated in the Divorce Decree. Rather, she argues that Debtor's waiver of his interest in the proceeds from the sale of the Residence violated this Court's confirmation order, which prohibited Debtor from disposing of estate property without prior court approval.

Under the facts of this case, the Court is not convinced by the Trustee's arguments that Debtor's waiver of his interest in the sale proceeds in the Settlement Agreement constitutes a violation of the confirmation order or that the Court should invalidate any provision of the Divorce Decree. As set forth above, the confirmation order indicated that Debtor "shall not sell, encumber or otherwise transfer any interest in estate property outside the ordinary course of business <u>without approval of the court</u>."[32]  Debtor did, however, obtain relief from stay from this Court to allow the Family Court to determine the "equitable division"—a matter not excluded from the stay's application under 11 U.S.C. § 362(b) that would have otherwise been stayed. Moreover, Debtor filed a motion seeking approval for the sale of the property, which is currently before the Court. As stated in the Consent Order Lifting Stay, the Court retained the ability "to review the determination by the Family Court as it may relate to the Debtor's bankruptcy case." This is a common

---

[32] ECF No. 24 (emphasis added).

approach taken by bankruptcy courts in recognition that domestic relations law "is an area of law with particular importance to state interests," while acknowledging that the Bankruptcy Court has the authority to review the equitable division to determine the allowance of claims established by the divorce and the impact on the creditors' recovery. *In re Chandler,* 441 B.R. 452, 464 (Bankr. E.D. Pa. 2010) ( "bankruptcy courts routinely modify the automatic stay to permit the conclusion of pending divorce proceedings to the extent necessary to administer the bankruptcy case."); *see also In re Johnson,* C/A No. 23-02461-EG, slip op. at 12 (Bankr. D.S.C. Oct. 27, 2023) (finding that "the Family Court has more specialized expertise regarding equitable distribution determinations in domestic cases and thus is the more appropriate forum to make the equitable distribution determination under state law.").

In support of her position, the Trustee cites to *In re Kostenko.* There, the court affirmed the bankruptcy court's finding that the property division provisions under the post-confirmation divorce decree were null and void and ineffective as the state court was precluded from dividing the non-exempt community property and debt before the debtor's case was closed. *Kostenko v. Kostenko (In re Kostenko)*, No. 2:12-BK-02741-DPC, 2015 WL 4154133, at *4 (B.A.P. 9th Cir. July 9, 2015). The facts of that case are distinguishable from the facts currently before the Court. The bankruptcy court in *Kostenko* indisputably retained control over the property of the estate and only granted limited relief from stay to proceed with the dissolution of the marriage, but "stated that the division of property and debts would remain under the jurisdiction of the bankruptcy court." *Id.* at *2; *see also In re Clouse*, 446 B.R. 690 (Bankr. E.D. Pa. 2010) (finding that postnuptial agreement that debtor executed after confirmation of plan violated automatic stay to extent that it required

debtor to make certain payments out of post confirmation earnings that served to replenish debtor's estate where no relief from stay was sought). That is *not* the case here. Debtor sought and was granted relief from stay to determine the equitable division of the marital assets—not solely the dissolution of his marriage to Ex-spouse.

"Until equitable distribution is accomplished, this Court is unable to discern not only the interests of the Debtor in the Property but also his interest in other estate assets." *Chandler,* 441 B.R. at 464 (citing *In re Leonard,* 231 B.R. 884, 889 (E.D. Pa. 1999)). Therefore, this Court authorized the Family Court to make the determinations regarding alimony and equitable property division, and now must determine the effect of the Family Court order on the property of the estate.

### B. Ex-spouse's Claim for Debtor's Half of the Proceeds from the Sale of the Residence Is A Domestic Support Obligation

Having determined that no provisions of the Divorce Decree or Settlement Agreement should be invalidated, the next issue is whether the Family Court order adopting the provision of the Settlement Agreement transferring the sale proceeds (less $28,000.00) to Ex-spouse is in the nature of a "domestic support obligation," as argued by Debtor and Ex-spouse, or is merely an equitable property settlement, as argued by the Trustee.

Given the context under which the issue arises in this case, the question of which party carries the burden of proof is not straightforward. The matter is before the Court pursuant to the Motion to Sell and the Motion to Modify Plan. Parties' requests to determine whether a claim is a property settlement or a domestic support obligation generally arise in the context of objections to proofs of claim. Here, Debtor bears the burden of proof on the Motion to Sell, which is undisputed, except as to the proposed

distribution of the proceeds. The Trustee bears the burden of proof to demonstrate that the

Plan should be modified, but the parties do not dispute that modification of the plan is

appropriate here—only how it should be modified. *See In re Murphy,* 327 B.R. 760, 774

n.12 (Bankr. E.D. Va. 2005), *aff'd,* 474 F.3d 143 (4th Cir. 2007).

Both Debtor and Ex-spouse agree that the obligation created by the Family Court

order is a domestic support obligation. Ex-spouse has filed a proof of claim asserting that

the payment of Debtor's share in the proceeds to her is a domestic support obligation.[33]

The Code establishes a burden-shifting framework for proving the validity and amount of

a claim. Initially, the filing of a proof of claim constitutes *prima facie* evidence of the

amount and validity of the claim, with the burden then shifting to the debtor to object to

the claim. *See In re Harford Sands Inc.,* 372 F.3d 637, 640 (4th Cir. 2004) (placing burden

of proof on claimant to establish validity and amount once the debtor has rebutted the

presumption). It goes without saying that determining where the burden of proof lies in

this context is a challenge. It appears that Debtor or Ex-spouse would carry the burden of

proof to prove that the obligation established by the Divorce Decree constitutes a domestic

support obligation under 11 U.S.C. § 101(14A) once the Trustee rebutted the presumption

that Ex-spouse's claim is what it purports to be on its face. Nevertheless, the Court would

reach the same result even if it concluded that the burden fell on the Trustee.

"Domestic support obligation" is defined in 11 U.S.C. § 101(14A), in pertinent part,

as "a debt that accrues before, on, or after the date of the order for relief" that is "owed to

or recoverable by a spouse [or] former spouse" that is "in the nature of alimony,

maintenance, or support . . . of such spouse [or] former spouse, . . . without regard to

---

[33] Proof of Claim No. 16-1.

whether such debt is expressly so designated" and that is "established or subject to establishment before, on or after the date of the order for relief in a case under this title, by reason of applicable provisions of (i) a separation agreement, divorce decree, or property settlement agreement . . . ." 11 U.S.C. § 101(14A).  To determine whether an obligation is in the nature of alimony, maintenance or support, the court must look to federal law.  *In re Krueger*, 457 B.R. 465, 474 (Bankr. D.S.C. 2011); *In re Poole*, 383 B.R. 308, 314 (Bankr. D.S.C. 2007); *In re Ludwig*, 502 B.R. 466 (Bankr. W.D. Va. 2013); *see also In re Cullison*, 628 B.R. 829 (Bankr. D.S.C. 2021).  A bankruptcy court is not bound by the language of the state court order or divorce decree describing an obligation as spousal support or property settlement.  *See Kreuger,* 457 B.R. at 474.  The Fourth Circuit has instructed bankruptcy courts to "look beyond the language of the divorce decree to determine the intent of the parties at the time the separation agreement was executed."  *Id.* (citing *Tilley v. Jessee,* 789 F.2d 1074, 1077-78 (4th Cir. 1986)); *see also In re Siegel,* 414 B.R. 79, 81 (Bankr. E.D.N.C. 2009) ("To determine the parties' intention, the court must consider not only the terms of the agreement, but also the overall circumstances of the parties.").

This Court has applied the following factors to determine whether an obligation is a domestic support obligation:

(1) the substance and language of the document in question;

(2) the financial condition of the parties at the time of the decree or agreement;

(3) the function served by the obligation and intent of the parties at the time of the agreement; and

(4)  whether there is evidence to question the intent of a spouse or evidence of overbearing by either party.

*Krueger*, 457 B.R. at 474 (Bankr. D.S.C. 2011); *In re Poole*, 383 B.R. at 314.

1.      **Substance and Language of the Agreement**

To determine whether the obligation created by the Settlement Agreement constitutes a domestic support obligation, the Court will first consider the substance and language of the Settlement Agreement.  The Trustee places emphasis on the fact that the waiver of the proceeds is mentioned in Section I of the Settlement Agreement, which is titled "Property Division."  Part A of that Section ("Real Estate") provides that "[Ex-spouse] shall list the home for sale by March 1, 2023 and continuously list the house for sale . . . . At closing, the parties shall pay off the mortgage and the HELOC.  At closing[, Debtor] shall be entitled to $28,000.00 from the net proceeds from the sale of the marital home."  Notably, however, a separate paragraph in the same section provides that Debtor "waives his interest in the equity of the home in excess of $28,000 in favor of [Ex-spouse]" and clarifies that "[t]he parties *intend* for this compromise to reflect [Debtor's] *domestic support obligation* to [Spouse]."  (Emphasis added).  While Section I is labeled as "Property Division," its plain language justifies a finding that a domestic support obligation was intended.

Section X is labeled "Alimony" and mentions the temporary alimony payment in the amount of $1,300.00 that Debtor was obligated to pay until June of 2022 (or the sale of the Residence, whichever date was sooner).  It further provides that Ex-spouse "waives all other claims or right to support other than that *which is specifically referenced herein*."  Therefore, it is logical to infer that "specifically referenced herein" refers to the "Property Division" section.

While labels and language in the agreement is not *per se* dispositive of the nature of the obligation arising under the agreement, it can provide persuasive evidence of the

parties' intent.  *Krueger,* 457 B.R. at 475 (citing *In re Johnson,* 397 B.R. 289, 298 (Bankr

M.D.N.C. 2008)).  Here, the language of the Settlement Agreement strongly indicates that

the payment of the sale proceeds to Ex-spouse was intended as a domestic support

obligation in the form of lump sum alimony.

### 2.    Financial Condition of the Parties at the Time of the Agreement

The second factor—the financial condition of the parties at the time the agreement

was entered into—may be met by a showing that there was a need for support on the part

of the party claiming entitlement to it.  *In re Krueger*, 457 B.R. at 476 (quoting *In re Pagels*,

No. 10–71138–SCS, 2011 WL 577337, at *13 (Bankr. E.D. Va. Feb. 9, 2011) (finding "a

showing of need for support on the part of the complainant at the time of the agreement

persuasive")).  In analyzing this factor, courts look at such variables as the parties' prior

work history and abilities, their physical health, income stability, potential earning power

and business opportunities, and future income needs.  *In re Combs,* 543 B.R. 780, 795

(Bankr. E.D. Va. 2016); *Krueger,* 457 B.R. at 476.

Ex-spouse testified that during their 26 years of marriage, she had always earned

less income than Debtor, and he had supported her and the family.  At the time the

Settlement Agreement was entered into, Ex-spouse's monthly take-home pay was less than

$3,500.00—compared to Debtor's monthly take-home pay of approximately $5,600.00.

According to the testimony presented, those figures still reflect their earnings.  Spouse

testified that she had been at the same job for the past 13 years and her pay had not

significantly fluctuated.  According to her testimony, for the five months that Debtor was

unemployed in 2021, she had to withdraw funds from her 401K to make ends meet for the

family.  She was also unable to afford to live in the Residence without Debtor's financial

assistance and needed to sell the Residence to purchase a less expensive home.  Ex-spouse's inability to afford to remain in the Residence is further supported by the Family Court's order requiring Debtor to pay $1,300.00 per month in alimony and half of the mortgage until the home was sold.

Ex-spouse is almost 58 years old.  After paying off the HELOC mortgage prior to the sale through the inheritance from her mother's estate, her half of the proceeds is $217,533.26—insufficient to find replacement housing in Lexington, South Carolina that would come anywhere close to the standard of living to which she was accustomed during her marriage.[34]  Moreover, according to the Settlement Agreement, she has three separate retirement accounts totaling $86,257.00 in funds as of November 2022,[35] and she waived any entitlement she may have had to Debtor's retirement and pension accounts.  Ex-spouse testified that the lump sum payment from the sale proceeds was intended to help her obtain a more affordable home.  Weighing all these facts, the Court finds that this factor tips the scales in favor of finding that the obligation created by the Settlement Agreement provision is in the nature of support and maintenance.

**3.      Function Served by the Obligation and the Intent of the Parties at the Time of the Agreement**

Next, the Court considers the function served by the obligation and the intent of the parties at the time of the Settlement Agreement.  This involves consideration of factors such as the parties' past and future circumstances, including how long the parties were

---

[34] To be clear, the Court is not suggesting that Ex-spouse should find replacement housing worth $850,000.00; however, taking judicial notice of the housing market in the area, it appears that, to purchase a home in that location, she may need to take out a mortgage.  Given the high interest rates, her mortgage payments may impact any disposable income that she would otherwise have for her other living expenses.

[35] This, however, appears inconsistent with the amounts set forth in her Financial Disclosure dated May 5, 2023 which indicates the value of her voluntary retirement account to be $133,233.49.  *See* Spouse's Ex. 3.

married, whether either party was at fault for the divorce, whether the parties had any children, and the parties' standard of living during the marriage. *In re Combs,* 543 B.R. at 796. The Court should also consider "'[w]hether the debt is for a past or future obligation, allocates debt, or divides property.'" *Krueger*, 457 B.R. at 477 (quoting *Pagels*, 2011 WL 577337, at *11). *See also In re Ludwig*, 502 B.R. at 470 (finding that the obligation was in the nature of property settlement because, among other things, it was based on joint obligations the parties had at the time of their divorce and debtor's obligation was to pay for past debts the couple owed).

Debtor and Ex-spouse were married for over two decades and divorced due to adultery on the part of Debtor. The Trustee does not dispute that Ex-spouse is entitled to receive alimony under state law. Pursuant to the Settlement Agreement, the parties agree "that each shall be responsible for all debt held in their individual names free and clear of all claims of the other and shall hold the other party harmless."[36] Accordingly, this is not the situation where Debtor's waiver of his interest in proceeds was to pay off past debts. Both Debtor and Ex-spouse testified that the payment to Ex-spouse of the lump sum from the sale proceeds was intended to be lump sum alimony to enable Ex-spouse to purchase an affordable home and help her with living expenses as she approaches retirement age. "An agreement that serves to provide such daily necessities as food, clothing, shelter, and transportation is indicative of debt intended to be in the nature of support." *In re Kreuger,* 457 B.R. at 477 (quoting *Pagels,* 2011 WL 577337, at *13).

Ex-spouse testified that she waived her rights to Debtor's pension and to receive attorney's fees in exchange for Debtor's agreement to waive his right to receive any sale

---

[36] Debtor's Ex. 9 at Section VIII.

proceeds in excess of $28,000.00.  Debtor testified that when the parties were in mediation

to negotiate the terms of the Settlement Agreement, he was told to expect to pay lifetime

alimony payments.  The mediator looked at the life expectancy of Ex-spouse, what the

present value of the future payments of periodic alimony would be, and the anticipated sale

of the Residence at $850,000.00 to help the parties arrive at the lump sum alimony payment

to Ex-spouse and his retention of $28,000.00 from the sale proceeds.  He confirmed that

Ex-spouse agreed to not seek her portion of his retirement benefits and to waive attorney's

fees as support in exchange for payment of the lump sum as spousal support from the equity

in the Residence.  He testified that he intended this payment of the sale proceeds to Ex-

spouse to be lump sum alimony in lieu of paying $1,300.00 per month.[37]

Lump sum alimony is allowed under the laws of South Carolina.  S.C. Code Ann.

§ 20-3-130 provides, in pertinent part:

> (B) Alimony and separate maintenance and support awards may be granted
> pendente lite and permanently in such amounts and for periods of time
> subject to conditions as the court considers just including, but not limited
> to:
> . . .
>> (2) Lump-sum alimony in a finite total sum to be paid in one
>> installment, or periodically over a period of time, terminating only
>> upon the death of the supported spouse, but not terminable or
>> modifiable based upon remarriage or changed circumstances in the
>> future.  The purpose of this form of support may include, but not be
>> limited to, circumstances where the court finds alimony appropriate but
>> determines that such an award be of a finite and nonmodifiable nature.

S.C. Code Ann. § 20-3-130(B)(2); *Hendricks v. Hendricks,* 330 S.E.2d 553, 554 (S.C. Ct.

App. 1985) ("Family courts have the power to award lump sum alimony, and the award

---

[37] Courts have also considered whether there are any tax benefits resulting from the divorce settlement agreement when determining the nature of an obligation.  *See, e.g., In re Krueger,* 457 B.R. at 478.  No evidence was presented regarding any tax benefits resulting from the Settlement Agreement for either party.

rests in their discretion.").  Moreover, the fact that support payments pursuant to a divorce decree are for a finite lump sum does not automatically render the obligation a property settlement.  *See, e.g.*, *In re Burkhalter*, 635 B.R. 284 (Bankr. N.D. Miss. 2022) (finding that debt of $1,647,500.00 arising from lump sum installment alimony was nondischargeable domestic support obligation); *In re Ginzi*, 430 B.R. 702 (Bankr. M.D. Fla. 2010) (finding lump sum payment for anticipated proceeds of sale of marital property to be in the nature of domestic support obligations); *In re Caputo,* No. 13-23542, 2014 WL 1600317 (S.D. Fla. Apr. 21, 2014) (finding that the record supported finding that the $200,000.00 lump-sum alimony payment was in the nature of support); *In re Inman*, No. 10-17707, 2012 WL 2374419 (Bankr. S.D. Fla. June 22, 2012) (finding that lump sum alimony was in nature of alimony for the benefit of defendant).

The facts in this case weigh in favor of a finding that the obligation created by the Settlement Agreement is in the nature of support.

### 4.    Evidence of Overbearing by Either Party

Finally, the Court turns to the last factor: evidence of overbearing by either party. Both Debtor and Ex-spouse were represented by counsel for the negotiation of the Settlement Agreement.  The Family Court expressly found that "[e]ach party entered into the written agreement freely and voluntarily without any coercion, duress, or pressure to enter into the agreement or without the promises made by anyone."  The record shows that the Family Court fully considered this issue and found no evidence of overbearing.  The testimony presented by Debtor and Ex-spouse is consistent with the Family Court's conclusion.  The age, health, education, and experience of Debtor and Ex-spouse are not

suggestive of overbearing in this case.  Accordingly, the Court finds no evidence of overbearing by either party.

Applying the foregoing factors, the Court finds that the weight of the evidence supports a conclusion that the obligation to pay Ex-spouse the sale proceeds in a lump sum under the Settlement Agreement is a "domestic support obligation" as defined in 11 U.S.C. § 101(14A) and not a property settlement.  Despite the Court's determination that Debtor's share of the sale proceeds is property of the estate, the Court finds that Ex-spouse is entitled to receive those proceeds as ordered by the Family Court.  As the Fourth Circuit noted in an unpublished case affirming the district court's reversal of the bankruptcy court's denial of the lifting of the stay to afford debtor's ex-wife the opportunity to establish the correct percentage of the marital property:

> We caution, as the district court cautioned, that bankruptcy courts should not be permitted to be used as draconian tools in divorce proceedings to deny a spouse what would be his or her due interest in an equitable distribution proceeding.  We also recognize that in some circumstances former spouses may collude to defeat one spouse's creditors.  Thus, a court, guided by the rubric we have applied, must give careful attention to the particular facts of the case.

*Roberge v. Buis*, 95 F.3d 42, 43 (4th Cir. 1996) (unpublished).  There is no evidence before the Court of collusion amongst the parties.  Moreover, the Court is not inclined to revisit what the Family Court found to be a proper and reasonable agreement between the parties.

The Trustee does not dispute that Ex-spouse is entitled to some form of alimony. She also takes the position that if the Court does not invalidate the provision in the Settlement Order waiving Debtor's interest in the proceeds from the sale—which the Court is not inclined to do—Ex-spouse's Claim No. 16 should be treated as a property settlement entitled to recovery with other unsecured creditors and not be allowed to receive the funds

directly outside of the Plan. Notably, that would result in a similar recovery for other unsecured creditors because Debtor's non-exempt half-interest in the proceeds ($152,033.27) would be shared amongst a pool of approximately $400,000.00 in unsecured debt compared to the current unsecured creditors being paid from increased plan payments which would possibly amount to $60,000.00-$70,000.00 over the remaining life of the Plan.[38]

At the hearing, the Trustee argued that even if the Court found that the lump sum obligation was in the nature of a "domestic support obligation" entitled to priority, it should be paid through the Plan. The Court disagrees. Section 1325(a)(8) provides that, in order to confirm a plan, the debtor must have "paid all amounts that are required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition if the debtor is required by a judicial or administrative order, or by statute, to pay such domestic support obligation." 11 U.S.C. § 1325(a)(8). To modify the Plan in any way, the obligation set forth by the Divorce Decree would have to be paid in full as it arose post-petition.[39]  *See* 11 U.S.C. § 1329(b)(1) ("Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.").

---

[38] The Court does not intend this to be a finding or indication of what the modified Plan should provide, as there are other considerations that need to be taken into account and the modified Plan will need to meet the requirements of the Bankruptcy Code—an issue left for another day.

[39] Moreover, the Court notes that the obligation in this case for the lump sum payment of the proceeds from the sale of the Residence does not fall within the definition of a priority claim pursuant to 11 U.S.C. § 507(a)(1) as Debor and Ex-Spouse seem to suggest (referring to "[a]llowed unsecured claims for domestic support obligations that, *as of the date of the filing of the petition in a case under this title*, are owed to or recoverable by a spouse, former spouse, or child of the debtor…"). *See also* 1 COLLIER FAMILY LAW AND THE BANKRUPTCY CODE ¶ 5.01.

Accordingly, the Court finds that the obligation to pay Ex-spouse the sale proceeds in a lump sum under the Settlement Agreement is a "domestic support obligation" under 11 U.S.C. § 101(14A) that should be paid directly to Ex-spouse.

### C. The Plan Should Be Modified To Take Into Account Debtor's Increased Income

While § 1306 indicates that all postpetition property and earnings are property of the estate in a chapter 13 case, it is usually only the property and earnings committed according to a confirmed plan that are to be paid to creditors. *In re Goldston*, 627 B.R. 841 (Bankr. D.S.C. 2021). The Fourth Circuit, however, has found that the receipt of additional post-confirmation assets which are substantial and unanticipated may serve as the basis to increase plan payments for the benefit of creditors. *See In re Murphy*, 474 F.3d 143 (4th Cir. 2007); *In re Arnold*, 869 F.2d 240 (4th Cir. 1989).

The evidence indicates that Debtor has experienced a substantial and unanticipated increase in income by obtaining employment during his bankruptcy case which increased his monthly disposable income from $393.33 to $2,409.39. Debtor's current plan payment to the Trustee is $352.00 per month. Debtor's Plan should be modified to increase the monthly payments to provide for an increased dividend to unsecured creditors. All parties—including Debtor—acknowledge that the Plan should be modified. At the hearing, the Trustee indicated that if the Court found the lump sum obligation under the Divorce Decree constitutes domestic support and thus is not to be included as part of the payments of a modified plan, the amount by which the plan payments would have to increase to take into account Debtor's salary increase would have to be determined. Accordingly, Debtor is required to amend the Plan within 15 days of the entry of this Order consistent with the requirements of the Bankruptcy Code, Bankruptcy Rules, SC LBR 3015-2, and this Order.

Prior to proposing any such modification, Debtor shall discuss possible payments to be proposed thereunder with the Trustee.  Within 15 days of the entry of this Order, the Closing Attorney shall release the remainder of the funds it is holding to Spouse, with the exception of $28,000.00, which shall be released directly to Debtor consistent with the provisions of the Divorce Decree.  As a result, and consistent with the statements of the parties at the hearing, Spouse's Claim Nos. 16 and 17 shall be withdrawn upon receipt of the funds.

## CONCLUSION

Based on the foregoing, the Trustee's Objection to the Motion to Sell is overruled. The proceeds held by the Closing Attorney representing Debtor's share of the proceeds from the sale of the Residence shall be turned over to Spouse in accordance with the Family Court Order and the provisions of this Order.  Debtor is further ordered to file a modified plan within 15 days of the entry of this Order after discussing the proper amount of plan payments with the Trustee.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**11/28/2023**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 11/28/2023